Turley, J.
delivered the opinion of the court.
The first question presented for the consideration of the court in this case is, whether the grant No. 235, from the State of North Carolina to John Gray, and Thomas Blount for five thousand acres of land, covers the premises in dispute. This grant calls to lie on both sides of the.two main forks of Duck river, beginning opposite to the mouth of the Wartrace fork, at a black walnut, a plumb-tree, and a hick *218 ory? &c, running thence west eight hundred and ninety-four poles to a white oak, thence south eight hundred and ninety four poles, to a stake, crossing the river, &.c. If in running the line south, the survey be stopped at the distance of eight hundred and ninety four poles, the land in dispute is not within the limits of the grant — but if the line be extended across the river, it is. This raises the question as to what construction shall be given to the grant. On the one hand, it is contended that the line must stop at the distance called for in the grant — on the other, that it must cross the river. This is not a new question, buf one which has been before the courts frequently. We are not therefore called upon to make a new precedent, but to follow old ones. This ques? tion was presented to the supreme court of the United States, in the case of Newsom vs. Pryor's lessee, 7 Wheat. 7, and it was held, that a call for a natural object, as a river, a known stream, a spring, or even a marked tree, shall control both course and distance, and that there is no distinction between a call to stop at a river, and a call to cross a river. Chief Justice Marshall, in delivering the opinion of the court, says, “The courts of Tennessee and all other courts, by whom cases of this description have been decided, have adopted the same principle and have adhered to it. It is, that the most material and most certain calls, shall control those which are less material pnd less certain.” Many other decisions to the same effect might be adduced. We consider this sufficient, as the question is at this day hardly de-bateable. There is then no doubt but that the grant does cover the disputed premises.
2. It is contended, that though by the rules of construe? tion adopted by the courts, the grant does cover the land in dispute, yet in the year 1808, John Overton and Jenkin Whiteside, to whom belonged the land covered by the grant of five thousand acres, caused the same to be processioned by Malcolm Gilchrist, a deputy surveyor of the second dis? trict, in conformity to the 21st section of the act of 1806, c 1, by which the third line, running south, instead of being extended across Duck river, in pursuance of the call of the grant, was made to stop at course and distance, three hun *219 dred poles short of Duck river, and that having done so, they are bound thereby and are estopped from now claiming to hold the land which would be included by extending the line to the natural object called for in the grant.
It is not denied that, where a tract of land has been processioned by its owner in pursuance of the provisions of the statute referred to, he is estopped from claiming otherwise than according to the procession; but it is denied, that in the case under consideration, any such processioning has ever taken place. This makes it necessary for us to inquire into the facts upon this question. It appears that John Overton, in 1808 or 9, went upon the lands with Malcolm Gilchrist, the deputy surveyor, for the purpose of making a procession of the same; that they commenced at the beginning, and ran the first line to the white oak called for, then the second, the course and distance, viz. 894 poles, at which point the surveyor stopped, and refused to proceed further; Overton contending that he should run on to the river in obedience to the express call of the grant, and not being able to agree upon this point, they stopped the survey and went to the principal surveyor, Wm. P. Anderson, for instructions; that Anderson directed Gilchrist to stop at the end of the distance of 894 poles called for, and Overton expressed his dissatisfaction with this result and refused to have any thing further to do with the processioning survey; that Gilchrist, without his presence or assent, proceeded to procession the land according to course and distance, disregarding the call for the river, and returned the plat and certificate of survey, which were received by the principal surveyor, and registered and laid down upon the general plan. It does not appear that Whitside had any agency whatever in this transaction. Is this a processioning of the land according to the provisions of the act of 1806, c 1, §21? We think most assuredly not. It is not pretended that a surveyor has it in his power under the provisions of said statute to procession lands, against the consent of the owner, and thereby force him to hold by lines, different from those called for in his grant — he is only made the agent to survey and mark at the request of the owner, in reasonable conformity with the original calls. If, upon applica *220 tion, he refuses to be governed by what the owner deems tc> be a reasonable conformity, and insists on running the lines differently, thereby depriving him of land included within his grant, he may refuse to have his land thus processioned, and thus put a stop to the re-survey. And if the surveyor will, (disregarding such dissent,) pertinaciously make the re-servey, according to his own views of propriety and correctness, it is a void act, binding on no one; and the rights of all parties remain the same as if the processioning survey had never been made. Such, we think, is the present case. Overton applied to have the tract of land processioned, he- and the surveyor disagreed as to the distance to which the second line should be extended, he being clearly right, and the surveyor clearly wrong; notwithstanding which the surveyor refuses to run the line otherwise than according to his views as to the distance; upon which Overton declined having, any thing further to do with the transaction, and left the surveyor without any authority from him for completing the resurvey: nevertheless this was done, and not in conformity with the calls of the grant, and greatly to the injury of the owners of the land. There can be then no pretence for saying, that this processioning and remarking was the act of the owners, it was the unauthorised act of the surveyor, and no estoppel can arise out of it.
But it is said, that Overton and Whiteside acquiesced in this re-survey, and that although they might not have been originally bound by it, yet they now are. by such acquis-cence.
The question of what acquiescence will deprive a man of a'portion of his estate, by making good an erroneous re-survey of his land, made without authority and originally void, is a very grave question, when it shall become necessary to determine it. We do not think that it arises here, because we think that there is no proof of an acquiescence on the part of Overton and Whitesides, nor any person claiming under them. The proof shows that the first time Cilchrist saw Whiteside, which was some eighteen months or two years thereafter, he expressed his dissatisfaction with the manner in which the land had been processioned and re-marked, and *221 Requested him to go back and extend the second line to the river, which he accordingly did, and also ran and marked the other two lines, in conformity therewith. Overton and Whiteside some short time thereafter, to wit, in the year 1813, took actual possession up to the lines, as thus last marked, and have held such possession by themselves and those claiming under them ever since openly and notoriously. Here then is no acquiescence.
But it is said, that this acquiescence is evidenced by a deed of partition made and executed between Overton and Whiteside, for the tract of land covered by the grant for five thousand acres, under which the premises in dispute are claimed. This deed of partition bears date, 1st day of May, 1807; and was executed several years before the processioning by Gilchrist heretofore spoken of. Its construction must therefore be in conformity with that which would have been given to the grant in relation to boundary, unless there be something upon its face which will compel the court to give to it a different construction; and we think there is nothing. The deed of partition having been executed before the re-marking by Gilchrist cannot be considered as having any relation thereto, or as being governed in any manner whatsoever thereby; and although, in describing the tract of five thousand acres, which was to be divided, it is merely said to lie on both sides of Duck river, without calling for the river, as the termination of the second line, yet we know not, upon what principle this can be held a waver of any rights secured to them by the grant: that it is no acquiescence in a survey made afterwards, is too obvious to require argument; that it can amount to no estoppel to claiming to the legal limits of theNgrant, cannot be contended for with success. A deed of partition is an estoppel between the parties to the deed, but no further; that is, either party is estopped from denying the partition as made by the deed; but we are at a loss to know upon what principle they are es-topped by the deed, from claiming from the state more land than may be contained in the deed, if there be more justly belonging to them. It cannot be pretended that, if more b» divided than they have title to, the state is estopped from *222 controverting their right; and the first principle of an estoppel is, that it must be mutual. Then even supposing, that the deed of partition did not divide all the land covered by the grant, the only consequence will be, that there remained a balance undivided, which tvas held in common by Overton' and Whiteside, subject to a subsequent division, which was afterwards made by Gilchrist under the direction of White-side, when the lines were extended to the river* in which' Overton acquiesced, each party taking possession and holding accordingly.
It is possible that it may have been considered that Over-ton and Whiteside were estopped, because Gilchrist, at the time he proeessioned and re-marked the land, also divided it between thetn in accordance therewith; but the same course of argument which proves that they were not bound by such processioning and re-marking, also equally proves that they were not bound by his division.
We do not consider that in the view we have taken of this bianch of the case, we have Unsettled any principle heretofore determined by our courts, or established any new doctrine endangering the stability of the land titles of the state. We merely assert what we apprehend has never been denied, that the act of 1806, cl, § 21, was not intended to authorise, nor does it authorise a surveyor to procession and re-mark a man’s land without his consent. This same case was before this court in 1833, and is reported in 5 Yer. 18. To the decision, as then made, we take no exceptions, but give to it our Unqualified assent, although in its result, different from the present; but the case was then presented upon a very different state of facts from what it now is. Judge Catron, who delivered the opinion of the court, assigns the following as the facts upon which it was founded — “That on opening of the Duck and Elk river county, the five thousand acres belonged to John Overton and Jenkin Whiteside. In February, 1808, they caused it to be processioned by Malcolm Gilchrist, a deputy surveyor of the .second district, in conformity to the 21st section of the land law of 1806. This survey was made with uncommon particularity, the first corner at the mouth of Wartrace fork of course was found, then running west, the' *223 white oak corner was found. But this was all the marking, save some poles west from the beginning, a marked line was found. Gilchrist ran south, marked the western boundary plainly, and made the south west corner upwards of three hundred poles short of Duck river, then ran east and marked .the southern side of the tract, and made the south east corner; then north to the beginning, marking the south east side. This done he proceeded to partition the tract between Overton and Whiteside, according to a covenant between them and by their consent. The boundary seemed to be settled and was recognised as a true one by Whiteside and Overton, until sometime about 1816 or 1818, when White-side claimed the second line to run across Duck river.”
It only requires a statement of the facts as they were said to exist, and as they are now presented to the court, to see upon what a different foundation the case rests now, from what it did then. Then it is said, that Overton and Whiteside .caused the land to be processioned by Gilchrist — now, it appears that Whiteside had no agency whatever in the transaction, and that Overton so soon as he ascertained that Gilchrist was determined to make the procession at variance with the calls of the grant, refused to have any thing more to do with it. Then, it is said, that Gilchrist proceeded to partition the tract between Overton and Whiteside by their instruction — now, it is obvious that his partition was made, without any such instruction. Then, it is said, that the boundary as made by Gilchrist was recognised by Overton .and Whiteside until 1816 or 1818 — now it is manifest that so soon as Whiteside saw Gilchrist after the tract had been processioned by him, he expressed his dissatisfaction and directed him to extend the lines according to the calls of the grant, which was done; and in 1813, both he and Overton took possession of the land up to the lines as then extended.
The case of Clark's Lessee vs. McElhanie, goes no further than the case in 5 Yer. which has just been commented upon, the court holding that Clark could not disaffirm his own survey, and go to his old corner to the prejudice of a subsequent .enterer. And, in the case of McLemore vs. Brown, it was only held upon this point, that in as much as the Legislature *224 by the act of 1819, c I, had authorised the surveyor of districts, in the case of the neglect of owners of granted lands in the Western Division of the State, to procession their lands and lay them down on the general plan, to do so for them; and that when this was done the owners might claim to the bounds re-marked against the state, and a subsequent enterer, —although they might be variant from the original lines, which could be established by proof; — and this, the more especially, as the same act prohibited the reception of entries for land within the limits thus re-marked. We therefore hesitate not to say, that there is no case within our knowledge, conflicting with the views expressed in this opinion.
3. But it is said thirdly and lastly, that the lessors of the plaintiff have not title to all the lands in dispute, unless it be by the operation of the statute of limitations. This is true, in as much as they have to deraign title through David Allison, the vendee of the grantees, and have only produced deeds of conveyance from a portion of his heirs. But it is deemed unnecessary to enter minutely into an investigation of this point, in as much as we are satisfied that the title of the lessors of the plaintiff has been perfected by the operation of the statute of limitations. It is proven that possession of the disputed premises was taken by Jenkin Whiteside in 1813; and that, the same was continued more than seven years by himself and those claiming under his title. At the time this possession was taken, John Overton and Jenkin Whiteside claimed title to all the land within the limits of the grant, by virtue of a deed of conveyance from Robert Hayes, Marshall of West Tennessee, bearing date 12th July, 1802. It is true that this deed of conveyance is founded upon a decree against David Allison, which is either void or voidable, (it is unnecessary to determine which;) for, inasmuch as the deed purports to convey all the land within the bounds of the grant, referring to it by number — and, in as much as we now determine, that the premises in dispute are covered by the grant, it follows, according to all the decisions, either on the statute of limitations of 1797, or on that of 1819, that possession under the deed for seven years will perfect the title, though it be founded on a voidable or void decree.
*225 From this view of the case, it will be seen, that we think the charge of the circuit Judge, on the several propositions discussed in this opinion, is erroneous. The judgment will therefore he reversed and the case remanded for a new trial.